ORIGINAL

1    HULETT HARPER STEWART LLP
DENNIS STEWART, SBN: 99152
2    JENNIFER A. KAGAN, SBN: 234554
550 West C Street, Suite 1600
3    San Diego, CA 92101
Telephone:     (619) 338-1133
4    Facsimile:     (619) 338-1139
5

6    Attorneys for Plaintiffs Susan Selfridge and
Amiee Corlett
7    [Additional Counsel on Signature Page]

FILED

07 FEB 15 PM 12: 17

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

BY: _____ DEPUTY

8    **IN THE UNITED STATES DISTRICT COURT**

9    **SOUTHERN DISTRICT OF CALIFORNIA**

10    SUSAN SELFRIDGE and AMIEE
11    CORLETT, on Behalf of Themselves and All
Others Similarly Situated,
12
               Plaintiffs,
13
14    v.

15    LG.Philips LCD Co., Ltd; LG.Philips LCD
America, Inc.; LG Electronics Inc.; Royal
16    Philips Electronics N.V.; Samsung
Electronics Co., Ltd.; Samsung
17    Semiconductor, Inc.; AU Optronics
Corporation; AU Optronics Corporation
18    America; Chi Mei Optoelectronics
Corporation; Chi Mei Optoelectronics USA,
19    Inc.; Sharp Corporation; Sharp Electronics
Corporation; Toshiba Corporation; Matsushita
20    Display Technology Co., Ltd.; Hitachi, Ltd.;
Hitachi Displays, Ltd.; Hitachi America, Ltd.;
21    Hitachi Electronic Devices (USA), Inc.;
22    Sanyo Epson Imaging Devices Corporation;
NEC Corporation; NEC LCD Technologies,
23    Ltd.; IDT International Limited; International
Display Technology Co., Ltd.; International
24    Display Technology USA Inc.; Chunghwa
25    Picture Tubes, Ltd.; and HannStar Display
Corporation,
26
27               Defendants.
28

Case No. '07 CV 0312 LAB WMc

**CLASS ACTION COMPLAINT**

**JURY DEMAND**

**INTRODUCTION**

1.       Plaintiffs bring this class action pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, to obtain injunctive relief for violations of Section 1 of the Sherman Act, 15 U.S.C. § 1, to recover damages under California state antitrust law and to recover the costs of suit, including reasonable attorneys' fees, for the injuries that Plaintiffs and all others similarly situated sustained as a result of Defendants' violations of those laws.

2.       This case arises out of a long-running nationwide conspiracy, beginning no later than January 1, 2002 ("Class Period"), among all Defendants and their co-conspirators with the purpose and effect of fixing prices, allocating the market, eliminating and suppressing competition, constraining supply, limiting capacity, and committing other unlawful practices designed to inflate and stabilize the prices of Thin-Film Transistor Liquid Crystal Displays (TFT-LCDs or panels).

3.       As a direct and proximate result of this conspiracy, Plaintiffs and all other similarly situated consumers paid artificially inflated prices for products utilizing TFT-LCD technology.  Such products include, but are not limited to, flat panel televisions and computer monitors, laptop computers, mobile phones, and digital music players.

**JURISDICTION AND VENUE**

4.       The Court has jurisdiction over the federal claim under 28 U.S.C. §§ 1331 and 1337.  The Court has jurisdiction over the California state law claim under 28 U.S.C. § 1367 because that claim is so related to the federal claim that it forms part of the same case or controversy.  The Court also has jurisdiction over the California state law claim under 28 U.S.C. § 1332 because the amount in controversy for the Class exceeds $5,000,000, and there are members of the Class who are citizens of a different state than the Defendants.

5.       Venue is proper in this District under 15 U.S.C. § 22 and 28 U.S.C. § 1391 because Defendants reside, transact business, or are found within this District, and a substantial part of the events giving rise to the claims arose in this District.

6.       The activities of the Defendants and their co-conspirators, as described herein, were within the flow of, were intended to, and did have a substantial effect on the foreign and

1

1  interstate commerce of the United States:

2                a.    Defendants and their co-conspirators participated in a continuous and

3  uninterrupted flow in interstate commerce to customers located in California;

4                b.    Defendants and their co-conspirators sold and shipped substantial

5  quantities of TFT-LCD to customers located in California;

6                c.    Data, information, correspondence and financial material were exchanged

7  between customers located in California and the Defendants and their co-conspirators; and/or

8                d.    Money flowed between banks in California and the Defendants and their

9  co-conspirators.

10    7.    The Defendants (directly or through agents who were at the time acting with actual

11  and/or apparent authority and within the scope of such authority, including each other as co-

12  conspirators) have:

13                a.    Transacted business in California;

14                b.    Contracted to supply or obtain services or goods in California;

15                c.    Intentionally availed themselves of the benefits of doing business in

16  California;

17                d.    Produced, promoted, sold, marketed or distributed their products or

18  services in California and, thereby, profited from their access to the markets in California;

19                e.    Caused tortious damage by acts or omissions in California;

20                f.    Caused tortious damage in California by acts or omissions committed

21  outside such jurisdictions while (i) regularly doing or soliciting business in such jurisdictions,

22  and/or (ii) engaging in other persistent courses of conduct within such jurisdictions, and/or

23  (iii) deriving substantial revenue from goods used or consumed or services rendered in such

24  jurisdictions; and

25                g.    Committed acts and omissions that Defendants knew or should have

26  known would cause damage (and, in fact, did cause damage) in California to Plaintiffs and

27  members of the Class while (i) regularly doing or soliciting business in such jurisdictions, and/or

28  (ii) engaging in other persistent courses of conduct within such jurisdictions, and/or (iii) deriving

2

1 | substantial revenue from goods used or consumed or services rendered in such jurisdictions.

2 |     8.    The Defendants otherwise had the requisite minimum contacts with California,

3 | such that, under the circumstances, it is fair and reasonable to require the Defendants to come to

4 | this Court to defend this action.

5 | **THE PARTIES**

6 | **Plaintiffs**

7 |     9.    Plaintiff Susan Selfridge, a California resident, purchased TFT-LCDs indirectly

8 | from one or more of the Defendants during the Class Period, for end use and not for resale, and

9 | was injured as a result of Defendants' illegal conduct.

10 |     10.    Plaintiff Amiee Corlett, a California resident, purchased TFT-LCDs indirectly

11 | from one or more of the Defendants during the Class Period, for end use and not for resale, and

12 | was injured as a result of Defendants' illegal conduct.

13 | **Defendants**

14 |     11.    Defendant LG.Philips LCD Co., Ltd. is a Korean corporation with its executive

15 | offices at LG Twin Towers, 20 Yoido-dong, Youngdungpo-gu, Seoul, South Korea.  LG.Philips

16 | LCD Co., Ltd. is a joint venture between LG Electronics Inc. and Royal Philips Electronics NV.

17 | During the time period covered in this Complaint, LG.Philips LCD Company Ltd. manufactured,

18 | sold and distributed TFT-LCD throughout the United States and the world.

19 |     12.    Defendant LG.Philips LCD America, Inc. is a California corporation with its

20 | principal place of business located at 150 East Brokaw Road, San Jose, California.  During the

21 | time period covered in this Complaint, LG.Philips LCD America, Inc. manufactured, sold and

22 | distributed TFT-LCD throughout the United States and the world.  LG.Philips LCD Company Ltd

23 | and LG.Philips LCD America, Inc. are collectively referred to herein as "LG.Philips."

24 |     13.    Defendant LG Electronics Inc. is a Korean corporation with its headquarters at LG

25 | Twin Towers 20, Yoido-dong, Youngdungpo-gu, Seoul, South Korea.  During the time period

26 | covered in this Complaint, LG Electronics Inc. was a venturer in LG.Philips LCD Co., Ltd. and

27 | was an active participant in the conduct herein described.

28 |     14.    Defendant Royal Philips Electronics N.V. is a Dutch corporation with its

3

1    headquarters at Breitner Center, Amstelplein 2, 1096 BC Amsterdam, The Netherlands. During

2    the time period covered in this Complaint, Royal Philips Electronics N.V. was a venturer in

3    LG.Philips LCD Co., Ltd. and was an active participant in the conduct herein described.

4        15.    Defendant Samsung Electronics Co., Ltd., is a Korean corporation with its

5    executive offices at Samsung Main Building, 250, 2-ga, Taepyung-ro, Jung-gu, Seoul, South

6    Korea. During the time period covered in this Complaint, Samsung Electronics Co., Ltd.

7    manufactured, sold and distributed TFT-LCD throughout the United States and the world.

8        16.    Defendant Samsung Semiconductor, Inc. is a California corporation located at

9    3655 North First Street, San Jose, California. Samsung Semiconductor, Inc. is a wholly owned

10   and controlled subsidiary of Defendant Samsung Electronics Co., Ltd. During the time period

11   covered by this Complaint, Samsung Semiconductor, Inc. manufactured, sold and distributed TFT-

12   LCD throughout the United States and the world. Samsung Electronics Co., Ltd. and Samsung

13   Semiconductor, Inc. are collectively referred to herein as "Samsung."

14       17.    Defendant AU Optronics Corporation is a Taiwanese corporation with its

15   headquarters at No. 1, Li-Hsin Road 2, Hsinschu Science Park, Hsinchu, Taiwan, R.O.C. During

16   the time period covered by this Complaint, AU Optronics Corporation manufactured, sold and

17   distributed TFT-LCD throughout the United States and the world.

18       18.    Defendant AU Optronics Corporation America is a wholly owned and controlled

19   subsidiary of Defendant AU Optronics Corporation. AU Optronics Corporation America is

20   headquartered at 9720 Cypresswood Drive, Suite 241, Houston, Texas. During the time period

21   covered by this Complaint, AU Optronics Corporation America manufactured, sold and distributed

22   TFT-LCD throughout the United States and the world. AU Optronics Corporation and AU

23   Optronics Corporation America are collectively referred to herein as "AU Optronics."

24       19.    Defendant Chi Mei Optoelectronics Corporation is a Taiwanese corporation with

25   its headquarters at No. 3, Sec.1, Huanshi Road, Southern Taiwan Science Park, Sinshih Township,

26   Tainan County, Taiwan R.O.C. During the time period covered in this Complaint, Chi Mei

27   Optoelectronics manufactured, sold and distributed TFT-LCD throughout the United States and

28   the world.

4

1    20.    Defendant Chi Mei Optoelectronics USA, Inc. is a wholly owned and controlled

2  subsidiary of Chi Mei Optoelectronics. Chi Mei Optoelectronics USA, Inc. is headquartered at

3  101 Metro Drive, Suite 510, San Jose, California. During the time period covered by this

4  Complaint, Chi Mei Optoelectronics USA, Inc. manufactured, sold and distributed TFT-LCD

5  throughout the United States and the world. Chi Mei Optoelectronics and Chi Mei

6  Optoelectronics USA, Inc. are collectively referred to herein as "CMO."

7    21.    Defendant Sharp Corporation is a Japanese corporation with its headquarters at 22-

8  22 Nagaike-cho, Abeno-ku, Osaka, 545-8522, Japan. During the time period covered by this

9  Complaint, Sharp Corporation manufactured, sold and distributed TFT-LCD throughout the

10 United States and the world.

11    22.    Defendant Sharp Electronics Corporation is a wholly owned and controlled

12 subsidiary of Sharp Corporation. Sharp Electronics Corporation is headquartered at One Sharp

13 Plaza, Mahwah, New Jersey. During the time period covered by this Complaint, Sharp Electronics

14 Corporation manufactured, sold and distributed TFT-LCD throughout the United States and the

15 world. Sharp Corporation and Sharp Electronics Corporation are collectively referred to herein as

16 "Sharp."

17    23.    Defendant Toshiba Corporation is a Japanese corporation with its headquarters at

18 1-1, Shibaura 1-chome, Minato-ku, Tokyo, 105-8001, Japan. During the time period covered by

19 this Complaint, Toshiba Corporation manufactured, sold and distributed TFT-LCD throughout the

20 United States and the world.

21    24.    Defendant Toshiba Matsushita Display Technology Co., Ltd. is a Japanese

22 corporation with its headquarters at Rivage Shinagawa, 1-8, Konan 4-chome, Minato-ku, Tokyo,

23 108-0075, Japan. During the time period covered by this Complaint, Toshiba Matsushita Display

24 Technology Co., Ltd. manufactured, sold and distributed TFT-LCD throughout the United States

25 and the world. Toshiba Corporation and Toshiba Matsushita Display Technology Co., Ltd. are

26 collectively referred to herein as "Toshiba."

27    25.    Defendant Hitachi, Ltd. is a Japanese corporation with its headquarters at 6-1

28 Marunouchi Center Building 13F, Chiyoda-ku, Tokyo, 101-0022, Japan. During the time period

5

1   covered by this Complaint, Hitachi, Ltd. manufactured, sold and distributed TFT-LCD throughout

2   the United States and the world.

3        26.   Defendant Hitachi Displays, Ltd. is a Japanese corporation with its headquarters at

4   AKS Bldg. 5F, 6-2 Kanda Neribei-cho 3, Chiyoda-ku, Tokyo 101-0022, Japan.  During the time

5   period covered by this Complaint, Hitachi Displays Ltd. manufactured, sold and distributed TFT-

6   LCD throughout the United States and the world.

7        27.   Defendant Hitachi America, Ltd. is a wholly owned and controlled subsidiary of

8   Hitachi, Ltd.  Hitachi America, Ltd. is a New York corporation with its headquarters at 50

9   Prospect Avenue, Tarrytown, New York.  During the time period covered by this Complaint,

10  Hitachi America Ltd. manufactured, sold and distributed TFT-LCD throughout the United States

11  and the world.

12       28.   Defendant Hitachi Electronic Devices (USA), Inc. is a wholly owned and

13  controlled subsidiary of Hitachi, Ltd.  Hitachi Electronic Devices (USA), Inc. with its headquarters

14  at 575 Mauldin Road, Greenville, South Carolina.  During the time period covered by this

15  Complaint, Hitachi Electronic Devices (USA), Inc. manufactured, sold and distributed TFT-LCD

16  throughout the United States and the world.  Hitachi, Ltd., Hitachi Displays, Ltd., Hitachi

17  America, Ltd., and Hitachi Electronic Devices (USA), Inc. are collectively referred to herein as

18  "Hitachi."

19       29.   Defendant Sanyo Epson Imaging Devices Corporation is a joint venture of Sanyo

20  Electric Co., Ltd. and Seiko Epson Corporation.  Sanyo Epson Imaging Devices Corporation is

21  headquartered at World Trade Building 15F, 2-4-1 Hamamatsu-cho, Minato-ku, Tokyo, Japan.

22  During the time period covered by this Complaint, Sanyo Epson Imaging Devices Corporation

23  manufactured, sold and distributed TFT-LCD throughout the United States and the world.

24       30.   Defendant NEC Corporation is a Japanese corporation with its headquarters at 7-1,

25  Shiba 5-chome, Minato-ku, Tokyo, Japan.  During the time period covered by this Complaint,

26  NEC Corporation manufactured, sold and distributed TFT-LCD throughout the United States and

27  the world.

28       31.   Defendant NEC LCD Technologies, Ltd. is a wholly owned and controlled

1  subsidiary of NEC Corporation. NEC LCD Technologies, Ltd. is a Japanese corporation with its

2  headquarters at 1753 Shimonumabe, Nakahara-ku, Kawasaki, Kanagawa, Japan. During the time

3  period covered by this Complaint, NEC LCD Technologies, Ltd. manufactured, sold and

4  distributed TFT-LCD throughout the United States and the world. NEC Corporation and NEC

5  LCD Technologies, Ltd. are collectively referred to herein as "NEC."

6       32.    Defendant IDT International Limited is an entity organized under the laws of

7  Bermuda with its principal place of business located at Block C, 9th Floor, Kaiser Estate Phase 1,

8  41 Man Yue Street, Hunghom, Kowloon, Hong Kong. During the time period covered by this

9  Complaint, IDT International Limited manufactured, sold and distributed TFT-LCD throughout

10  the United States and the world.

11       33.    Defendant International Display Technology Co., Ltd. is a Japanese corporation

12  with its headquarters at Nansei Yaesu Bldg. 3F, 2-2-10 Yaesu, Chuo-ku, Tokyo 104-0028, Japan.

13  Defendant International Display Technology Co., Ltd. is a subsidiary of Defendant Chi Mei

14  Optoelectronics Corporation. During the time period covered by this Complaint, International

15  Display Co., Ltd. manufactured, sold and distributed TFT-LCD to customers throughout the

16  United States and the world.

17       34.    Defendant International Display Technology USA Inc. is a corporation with its

18  principal place of business at 101 Metro Drive, Suite 510, San Jose, California. International

19  Display Technology USA Inc. is a subsidiary of Defendant Chi Mei Optoelectronics Corporation.

20  During the time period covered by this Complaint, International Display Technology USA Inc.

21  manufactured, sold and distributed TFT-LCD to customers throughout the United States and the

22  world.

23       35.    Defendant Chunghwa Picture Tubes, Ltd. is a Taiwanese corporation with its

24  headquarters at 1127 Hopin Road, Padeh City, Taoyuan, Taiwan, R.O.C. During the time period

25  covered by this Complaint, Chunghwa Picture Tubes Ltd. manufactured, sold and distributed TFT-

26  LCD throughout the United States and the world.

27       36.    Defendant HannStar Display Corporation is a Taiwanese corporation with its

28  headquarters at No. 480, Rueiguang Road, 12th Floor, Neihu Chiu, Taipei, 114, Taiwan, R.O.C.

7

Case 3:07-cv-02915-SI    Document 1-2    Filed 06/05/2007    Page 9 of 24

Case 3:07-cv-00312-LAB-WMC    Document 1-1    Filed 02/15/2007    Page 9 of 24 .

1    During the time period covered by this Complaint, HannStar Display Corporation manufactured,

2    sold and distributed TFT-LCD throughout the United States and the world.

3    **Co-conspirators**

4              37.    Various individuals, partnerships, corporations and associations not named as

5    Defendants in this Complaint (the "co-conspirators") have participated in the violations of the

6    antitrust law of California for which Plaintiffs seek relief, and have performed acts and made

7    statements in furtherance of the conspiracy.

8              38.    The acts charged in this Complaint have been done by Defendants or were ordered

9    or done by Defendants' officers, agents, employees, or representatives, while actively engaged in

10   the management of Defendants' affairs.

11             39.    Each of the Defendants named herein acted as an agent or joint venturer of or for

12   the other Defendants with respect to the acts, violations and common course of conduct alleged

13   herein.  Each Defendant which is a subsidiary of a foreign parent acts as the sole agent in the

14   United States for TFT-LCD made by its parent company.

15                              **CLASS ACTION ALLEGATIONS**

16             40.    Plaintiffs bring this suit as a class action pursuant to Rules 23(b)(2) and 23(b)(3) of

17   the Federal Rules of Civil Procedure, on behalf of themselves and a Plaintiff Class ("the Class")

18   composed of and defined as follows:

19         All persons and entities residing in California who, from January 1, 2002 to
           present, purchased TFT-LCD in the United States indirectly from the Defendants.
20

21   Specifically excluded from this Class are the Defendants; the officers, directors or employees of

22   any Defendant; any entity in which any Defendant has a controlling interest; and any affiliate,

23   legal representative, heir or assign of any Defendant.  Also excluded are any federal, state or local

24   governmental entities.

25             41.    This action has been brought and may properly be maintained as a class action

26   pursuant to Rule 23 of the Federal Rules of Civil Procedure for the following reasons:

27             a..    The Class is ascertainable and there is a well-defined community of interest

28   among the members of the Class;

                                          8

1          b.      Based upon the nature of the trade and commerce involved, together with

2   the number of indirect purchasers of TFT-LCD, Plaintiffs believe that the members of the Class

3   are sufficiently numerous such that joinder of all Class members is not practicable;

4          c.      Plaintiffs' claims are typical of the claims of the members of the Class

5   because Plaintiffs indirectly purchased TFT-LCD from one or more of the Defendants or their co-

6   conspirators and, therefore, have claims that arise from the same course of conduct that gives rise

7   to the claims of the members of the Class and seek relief that is common to the Class;

8          d.      The following questions of law or fact, while not exclusive, are common as

9   to the members of the Class:

10                 i.      Whether Defendants formed and operated a combination or

11  conspiracy to fix, raise, maintain or stabilize the prices of the market for TFT-LCD;

12                 ii.     Whether Defendants formed and operated a combination or

13  conspiracy in order to allocate the market for TFT-LCD;

14                 iii.    The operative time period of the Defendants' combination or

15  conspiracy;

16                 iv.     Whether Defendants' conduct caused injury to the business or

17  property of Plaintiffs and the members of the Class;

18                 v.      The appropriate measure of the amount of damages suffered by the

19  Class;

20                 vi.     Whether Defendants' conduct violates § 1 of the Sherman Act;

21                 vii.    Whether Defendants' conduct violates Cal. Bus. & Prof. Code

22  §§ 16720, *et. seq.*; and

23                 viii.   The appropriate nature of class-wide equitable relief.

24         e.      These and other common questions of law or fact predominate over any

25  questions affecting only individual members of the Class;

26         f.      After a determination is made as to the predominating issues indicated

27  above, the Class can be divided into logical and manageable subclasses;

28         g.      Plaintiffs will fairly and adequately represent and protect the interests of

9

1    the members of the Class and has no interests antagonistic to the Class. Plaintiffs have suffered

2    the same harm as the members of the Class and have, and will continue to, zealously pursue claims

3    against Defendants. Plaintiffs have retained counsel competent and experienced in the prosecution

4    of complex class actions, and in particular, counsel has broad experience in complex antitrust

5    litigation similar in size, scope, and complexity to the present case.

6         42.    A class action is superior to the alternatives, if any, for the fair and efficient

7    adjudication of this controversy. The damages suffered by each individual Class member will

8    likely be relatively small, especially given the burden and expense of individual prosecution of the

9    complex litigation necessitated by Defendants' conduct. Thus, it would be virtually impossible for

10   the Class members individually to redress effectively the wrongs done to them. Moreover, even if

11   the Class members themselves could afford such individual litigation, the judicial system could

12   not. Individualized litigation presents a potential for inconsistent or contradictory judgments.

13   Individualized litigation increases the delay and expense to all parties and the judicial system due

14   to the complex legal and factual issues presented by this case. By contrast, the class action device

15   presents far fewer management difficulties and provides the benefits of single adjudication,

16   economy of scale, and comprehensive supervision by a single court.

17        43.    Defendants have acted or refused to act on grounds generally applicable to the

18   Class, thereby making appropriate final injunctive relief with respect to the Class as a whole.

19        44.    In the absence of a class action, Defendants would be unjustly enriched as they

20   would be permitted to retain the benefits acquired by way of their wrongful and illegal conduct.

21                          **NATURE OF TRADE AND COMMERCE**

22        45.    Throughout the Class Period, Defendants and their co-conspirators engaged in the

23   business of manufacturing, marketing, and selling TFT-LCD throughout the United States and the

24   world. During each year of the Class Period, sales of TFT-LCD totaled in the billions of dollars.

25   According to estimates, the global LCD market will reach $69 billion in 2006.

26        46.    The most common application of liquid crystal technology is in LCDs and the

27   most common form of LCD is the TFT-LCD. TFT-LCD is an active matrix LCD that utilizes

28   thin-film transistor technology to improve the quality of the projected image. As an active matrix,

10

1    the image-forming pixels are individually controlled by the transistor. Functionally, the basic

2    structure of a TFT-LCD panel includes two glass substrates that sandwich a layer of liquid crystal.

3    The front glass substrate is fitted with a color filter. The back glass substrate has transistors

4    fabricated on it. When voltage is applied to the transistor, the liquid crystal is bent, thus allowing

5    light to pass through and form a pixel. The front glass substrate then gives each pixel its own

6    color, the combined effect of which is the formation of an image.

7         47.    As used herein, the term TFT-LCD includes all types of TFT-LCDs sold during

8    the Class Period.

9         48.    The types of TFT-LCD manufactured by Defendants are utilized in a broad array

10    of consumer applications. Representative products utilizing this technology include flat panel

11    televisions and computer monitors, laptop computers, mobile phones, and digital music players.

12    As such, these items are purchased by consumers both as stand-alone products and as parts of

13    integrated products.

14         49.    The Defendants sell their products to numerous end-brand customers, including

15    the world's leading manufacturers of the aforementioned product types. Consumers, in turn,

16    purchase TFT-LCD containing goods from these end-brand customers.

17         50.    The market for the manufacture and sale of TFT-LCD is conducive to the type of

18    collusive activity herein alleged. The market is oligopolistic in nature, with three suppliers

19    controlling more than 60% of the market. According to the market research firm iSuppli, in 2005,

20    the world's three largest LCD makers by shipments were LG Philips (21.3%), Samsung (20.8%),

21    and AU Optronics (20.2%).

22         51.    This oligarchy of suppliers is even more pronounced within the specific categories

23    of LCD panels. For example, LG Philips, Samsung and AU Optronics account for more than 66%

24    of the LCD TV panel market, which is the fastest growing sector within the LCD industry. The

25    inclusion of Chi Mei Optoelectronics boosts the market share of the top four suppliers to nearly

26    82%. Moreover, 76.8% of the market for Notebook PC LCD panels is controlled by the same

27    three top suppliers. By including Chi Mei Optoelectronics in the analysis, the market share of the

28    top four suppliers surpasses 86%. With this type of market control, major producers are able to

1  extract unusually high gross margins, such as the 22.3% and 25.0% margins claimed by LG

2  Philips for the years 2003 and 2004, respectively.

3      52.    Retention of this control is facilitated by significant barriers to entry into the LCD

4  market.  These barriers are both technological and financial.  "Due to the capital intensive nature

5  of the display industry and the high production volumes required to achieve economies of scale,

6  the international market for display device is characterized by significant barriers to entry," states

7  a 2005 filing by LG Philips with the Securities and Exchange Commission.  Samsung, for

8  example, has invested $2.3 billion in the first phase of its new production line of LCD panels in

9  Tangjung, South Korea.  The company has indicated it will invest another $1.7 billion in the line's

10  second production phase.  Similarly, Sharp recently invested $1.35 billion to build a factory in

11  Kameyama, Japan that will focus its capacity solely on the production of panels for LCD TVs that

12  measure 40 inches or more.  Once built, these production facilities are expensive to operate.  In

13  2005, it was estimated that TFT-LCD producers spent more than $30 million per day on

14  maintaining these plants and the equipment.

15      53.    The structure of the industry itself facilitates collusive conduct by way of

16  numerous cross-licensing arrangements between supposed competitors.  Samsung and Sharp

17  entered into such an agreement in 2006.  Sharp also has a cross-licensing agreement with AU

18  Optronics.  In 2002, six companies (Chi Mei, AU Optronics, Chung Hwa Picture Tubes, Ltd.,

19  Toppoly Optoelectronics Corp., Quanta Display Inc., and HannStar Display Corp.) entered into a

20  seven-year license agreement with the Industrial Technology Research Institute ("ITRI"), whereby

21  the parties were permitted to jointly possess certain common TFT-LCD patents.

22      54.    The TFT-LCD display industry is replete with trade groups and member

23  organizations to which all the major producers of TFT-LCD belong.  Irrespective as to the stated

24  mission of these groups and organizations, the practical effect of their existence is the creation of

25  opportunities for collusion among market participants.  The Society of Information Display

26  ("SID"), for example, touts on its website several benefits of membership, including "many

27  opportunities for networking with your peers and with leaders in the field-in person and

28  electronically."  Moreover, groups like SID inject themselves into "all of the technical and

12

1  business disciplines that relate to display research, design, manufacturing, applications, marketing

2  and sales." As such, the information shared at these formal and informal gatherings necessarily

3  impacts all levels of the manufacture, marketing, and sale of TFT-LCD.

4       55.    Significant consolidation among industry leaders has also occurred during the

5  period alleged in this Complaint. The acquisition by AU Optronics of Quanta Display is

6  indicative of this fact (AU Optronics was itself a product of the merger between Acer Display and

7  Unipac Optoelectronics). Sharp also acquired Fujitsu Limited's LCD business in 2005.

8  **DEFENDANTS' ILLEGAL CONDUCT**

9       56.    Beginning on or about January 1, 2002, Defendants and their co-conspirators

10  entered into an agreement, contract, combination, trust and/or conspiracy, the effect of which was

11  to artificially inflate the prices at which they sold TFT-LCD.

12       57.    Defendants, through their officers, directors and employees, effectuated the

13  aforesaid contract, combination, trust or conspiracy between themselves and their co-conspirators

14  by, among other things:

15            a.    Participating in meetings and conversations, including through various

16  trade associations and committees, to discuss the prices of TFT-LCD in the United States;

17            b.    Agreeing, during those meetings and conversations, to charge prices at

18  specified levels and otherwise to increase and maintain prices of TFT-LCD sold in the United

19  States by way of artificially constraining the production of TFT-LCD;

20            c.    Issuing price announcements and quotations in accordance with the

21  agreements reached; and

22            d.    Selling TFT-LCD to various customers in the United States at non-

23  competitive prices.

24       58.    The display industry has been marked historically by volatile supply-demand

25  swings, what is termed in the industry as the "crystal cycle." The boom-and-bust cycle historically

26  seen in the LCD industry results from alternating periods of oversupply and shortage, creating

27  downward and upward pressure on panel prices. When prices are high, manufacturers invest in

28  more production facilities which results in overproduction. Prices drop, creating more demand,

1   which causes manufacturers to invest in even more production facilities to satisfy the demand.

2   Then the cycle repeats.

3       59.    Back in 1999, there was a significant excess demand for LCD panels. Notebook

4   computer makers were not able to fill orders because they could not get the displays to complete

5   them. As a result, panel manufacturers poured as much as $5 billion into the construction of new

6   factories – notably in Korea and Taiwan – which had analysts predicting an oversupply.

7       60.    In order to avoid the next downturn in the "crystal cycle," manufacturers began to

8   devise strategies to coordinate their efforts to avoid a competitive market.

9       61.    At least as far back as the first quarter of 2002, the existence of supply constraints

10   in the manufacture of TFT-LCD were noted by DisplaySearch, a leading industry group. The

11   supply constraints were linked to a 6% increase in LCD monitor prices during the quarter.

12   DisplaySearch noted these price increases limited the ability of LCD monitor brands to offer

13   discounts or rebates on the product. The widening price gap between TFT-LCDs and the

14   traditional Cathode Ray Tube ("CRT") display forced companies to bundle LCDs with other

15   equipment so as to disguise the price being paid by the consumer for the LCD monitor. Moreover,

16   these price increases continued throughout what is traditionally considered to be the slow summer

17   buying season when demand is lowest.

18       62.    During the time period covered by this Complaint, DisplaySearch also noted a

19   decrease in the utilization of the fabrication plants where TFT-LCD was manufactured. From the

20   second to the third quarter of 2002, it was projected that the number of fabrication plants operating

21   at 90% or more of their capacity would decrease from 30 to 14 while the actual number of

22   fabrication facilities increased from 49 to 53. This type of decrease in operating capacity is

23   consistent with the later public sentiments of a leading producer of LCD glass who stated at an

24   industry convention in Taiwan that the industry should take a collective look at reducing capacity

25   to 85% in order to avoid price reductions.

26       63.    As the conspiracy continued through 2003, the manufacturers of TFT-LCD were

27   able to continue increasing prices while at the same time shipping record amounts of the product.

28   This series of price increases was the result of strong demand growth and smaller than expected

14

1   supply growth.    Analysts have also referenced the parallel pricing that was offered by the

2   manufacturers of TFT-LCD during this period.

3          64.    According to an article in the Korea Herald, citing "industry sources," both

4   Samsung and LG Philips announced price increases of 3 to 5 percent on their 15 inch and 17 inch

5   LCD screens in May 2003.    The move was purportedly intended to provoke the Taiwanese

6   manufacturers, which control the largest market share for smaller LCD panels, to raise their prices.

7   In the second half of 2003, the average price of LCDs larger than 10-inches rose from $219 in the

8   second quarter to $271 in the fourth quarter.

9          65.    The profit margin for TFT-LCD panels continued to rise and/or stabilize over the

10  Class Period, even though the industry reached maturation and a decrease in input costs.

11         66.    In a May 2006, presentation in Taiwan, the executive vice president of AU

12  Optronics noted that prices for panels were dropping as fast as the decrease in production costs.

13  He urged his competitors to reduce their capacity utilization rate by five to ten percent, in order to

14  avoid further price erosion.    The AU Optronics executive stressed that as long as makers lower

15  their capacity utilization rate by five to ten percent, a balanced supply-demand situation can be

16  easily achieved and further price erosion avoided.

17         67.    Samsung signaled its willingness to go along with a capacity reduction by stating

18  at the same conference that "it was possible to secure a reasonable amount of profit while

19  following the industry leaders."

20         68.    According to reports of the conference, Eddie Chen, spokesman for defendant Chi

21  Mei Optoelectronics, reiterated that reduction of capacity utilization might be initiated if demand

22  for panels continued to be weak.

23         69.    In June 2006, Quanta Display, Inc., (which was subsequently purchased by AU

24  Optronics), publicly announced that it had agreed to cut back on panel production after discussing

25  the situation with AU Optronics. In a Bloomberg article dated June 2, 2006, Tsai Chuan-chuan, a

26  spokeswoman for Quanta Display, was quoted as stating the move was made after discussions

27  with AU Optronics for "inventory control" reasons.    In the same article, Max Cheng, the chief

28  financial officer of AU Optronics, noted that AU Optronics' capacity utilization was at 95 percent,

15

1  and stated: "Our principle is not to have inventory. If we have more orders then we will have

2  more loading." This confirmed publicly that AU Optronics had reduced its fab utilization as

3  signaled in May 2006. Shortly thereafter, AU Optronics cut its capacity utilization to 90 percent.

4      70.    By August 2006, prices for LCD panels began to rise.

5  **INVESTIGATIONS RELATING TO DEFENDANTS' CONDUCT**

6      71.    In December 2006, South Korean flat screen makers LG.Philips LCD Co., Ltd.

7  and Samsung Electronics Co., Ltd., the world's two leading LCD makers, each confirmed they are

8  being investigated by both the Korean Fair Trade Commission and the United States Department

9  of Justice ("DOJ") "as part of an investigation of possible anticompetitive conduct in the LCD

10  industry." Sharp Corp., AU Optronics and the U.S. subsidiary of Chi Mei Optoelectronics also

11  acknowledged contact with the DOJ.

12      72.    The European Commission confirmed on December 12, 2006 that it too has

13  opened an investigation into the price fixing allegations.

14      73.    And in Japan, the Japanese trade watchdog, Japanese Fair Trade Commission

15  ("JFTC"), is investigating Sharp, NEC and LG Philips and at least seven other manufacturers for

16  allegedly agreeing to cut output to curb declines in panel prices.

17  **ACTIVE CONCEALMENT**

18      74.    Throughout and beyond the Class Period, Defendants and their co-conspirators

19  affirmatively and actively concealed their unlawful conduct from Plaintiffs, advancing their

20  conspiracy in secret. Defendants and their co-conspirators provided public justifications for price

21  increases and supply constraints that were pretextual and false. Plaintiffs did not discover, and

22  could not have discovered through the exercise of reasonable diligence, the illegal conspiracy

23  effected by the Defendants and their co-conspirators until shortly before this litigation was

24  commenced.

25      75.    As a result of the active concealment of the conspiracy by Defendants and their co-

26  conspirators, all otherwise-applicable statutes of limitations have been tolled.

27

28

16

1

## FIRST CLAIM FOR RELIEF

2

### Violation of Section 1 of the Sherman Act

3    76.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every

4    allegation set forth in the preceding paragraphs of this Complaint.

5    77.    Beginning at a time presently unknown to Plaintiffs, but at least as early as

6    January 1, 2002 and continuing through the present, the exact dates being unknown to Plaintiffs,

7    Defendants and their co-conspirators entered into a continuing agreement, understanding, and

8    conspiracy in restraint of trade to artificially raise, fix, maintain, and/or stabilize prices for TFT-

9    LCD in the United States, in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

10    78.    In formulating and carrying out the alleged agreement, understanding, and

11    conspiracy, the Defendants and their co-conspirators did those things that they combined and

12    conspired to do, including but not limited to the acts, practices, and course of conduct set forth

13    above, and the following, among others:

14           a.    To fix, raise, maintain and stabilize the price of TFT-LCD;

15           b.    To allocate markets for TFT-LCD among themselves;

16           c.    To submit rigged bids for the award and performance of certain TFT-LCD

17    contracts; and

18           d.    To allocate among themselves the production of TFT-LCD.

19    79.    The combination and conspiracy alleged herein has had the following effects,

20    among others:

21           a.    Price competition in the sale of TFT-LCD has been restrained, suppressed,

22    and/or eliminated in the United States;

23           b.    Prices for TFT-LCD sold by Defendants and their co-conspirators have

24    been fixed, raised, maintained and stabilized at artificially high, non-competitive levels throughout

25    the United States; and

26           c.    Those who purchased TFT-LCD directly or indirectly from Defendants and

27    their co-conspirators have been deprived of the benefits of free and open competition.

28    80.    Plaintiffs have been injured and will continue to be injured in its business and

17

1   property by paying more for TFT-LCD purchased indirectly from the Defendants and their co-

2   conspirators than it would have paid and will pay in the absence of the combination and

3   conspiracy, including paying more for personal computers and other products in which TFT-LCD

4   is a component as a result of higher prices paid for TFT-LCD by the manufacturers of those

5   products.

6         81.    Plaintiffs and the Class are entitled to an injunction against Defendants, preventing

7   and restraining the violations alleged herein.

8   **SECOND CLAIM FOR RELIEF**

9   **Violation of California Cartwright Act**

10         82.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every

11   allegation set forth in the preceding paragraphs of this Complaint.

12         83.    During the Class Period, each of the Defendants named herein, directly or

13   indirectly and through affiliates they dominated and controlled, manufactured, sold and/or

14   distributed TFT-LCD in California.

15         84.    During the Class Period, each of the Defendants named herein, directly or

16   indirectly and through affiliates they dominated and controlled, engaged in a trust in violation of

17   Cal. Bus & Prof. Code §§ 16720, *et. seq.* to carry out restrictions in trade and commerce, to limit

18   or reduce production, and to fix increase and or stabilize prices.  In combining and conspiring in

19   the creation of an illegal trust, the defendants did the following:

20         a.    Participated in meetings, conversations, and communications in the United

21   States and elsewhere with competitors to discuss the prices of TFT-LCD to be sold in California

22   and the United States;

23         b.    Agreed, during those meetings, conversations, and communications, to

24   charge prices of TFT-LCD at certain levels to be sold in California and the United States;

25         c.    Issued price quotations in accordance with the agreements reached; and

26         d.    Exchanged information on sales of TFT-LCD to customers, for the purpose

27   of monitoring and enforcing adherence to the agreed-upon prices.

28         85.    This horizontal price-fixing conspiracy and other violations of Cal. Bus. & Prof.

18

1  Code §§ 16720, *et. seq.* restrained trade or commerce in California and was designed to have, and

2  did have, a substantial and adverse impact on prices for TFT-LCD in California during the Class

3  Period.

4      86.    As a result, Plaintiffs and other members of the Class have sustained damages in

5  an amount to be determined at trial.

6  **PRAYER FOR RELIEF**

7      WHEREFORE, Plaintiffs pray:

8      A.    That the Court determine that the Sherman Act and the Cartwright Act claims

9  alleged herein may be maintained as a class action under Rule 23(a), (b)(2), and (b)(3) of the

10 Federal Rules of Civil Procedure;

11     B.    That the unlawful conduct, contract, conspiracy or combination alleged herein be

12 adjudged and decreed to be:

13          i.    A restraint of trade or commerce in violation of Section 1 of the Sherman

14 Act, as alleged in the First Claim for Relief;

15          ii.   An unlawful trust in violation of the California antitrust laws as identified

16 in the Second Claim for Relief herein;

17          iii.  That Plaintiffs and the Class recover damages, as provided by federal and

18 California state antitrust law, and that a joint and several judgment in favor of Plaintiffs and the

19 Class be entered against the Defendants in an amount to be trebled in accordance with such laws;

20     C.    That Defendants, their affiliates, successors, transferees, assignees, and the

21 officers, directors, partners, agents, and employees thereof, and all other persons acting or

22 claiming to act on their behalf, be permanently enjoined and restrained from in any manner:

23 (1) continuing, maintaining, or renewing the conduct, contract, conspiracy or combination alleged

24 herein, or from entering into any other conspiracy alleged herein, or from entering into any other

25 contract, conspiracy or combination having a similar purpose or effect, and from adopting or

26 following any practice, plan, program, or device having a similar purpose or effect; and (2)

27 communicating or causing to be communicated to any other person engaged in the sale of TFT-

28 LCD, information concerning bids of competitors;

1        D.      That Plaintiffs be awarded restitution, including disgorgement of profits obtained

2  by Defendants as a result of their acts of unfair competition and acts of unjust enrichment;

3        E.      That Plaintiffs and members of the Class be awarded pre- and post-judgment

4  interest, and that that interest be awarded at the highest legal rate from and after the date of service

5  of the initial complaint in this action;

6        F.      That Plaintiffs and members of the Class recover their costs of this suit, including

7  reasonable attorneys' fees as provided by law; and

8        G.     That Plaintiffs and members of the Class have such other, further, and different

9  relief as the case may require and the Court may deem just and proper under the circumstances.

10                          **DEMAND FOR JURY TRIAL**

11     Plaintiffs hereby demand a trial by jury.

12  DATED: February 14, 2007            HULETT HARPER STEWART LLP
                                    DENNIS STEWART
13                                    JENNIFER A. KAGAN

14

15

16                                    DENNIS STEWART

17
18                                    550 West C Street, Suite 1600
                                    San Diego, CA 92101
19                                    Telephone:   (619) 338-1133
                                    Facsimile:    (619) 338-1139

20
21                                    GERGOSIAN & GRALEWSKI LLP
                                    EDWARD M. GERGOSIAN
22                                    ROBERT J. GRALEWSKI, JR.
                                    550 West C Street, Suite 1600
23                                    San Diego, CA 92101
                                    Telephone:   (619) 230-0104
24                                    Facsimile:    (619) 230-0124

25                                    Attorneys for Plaintiffs Susan Selfridge and
                                    Amiee Corlett

26

27

28

                                  20

JS 44 (Rev. 3/99)  **CIVIL COVER SHEET**

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

**I. (a) PLAINTIFFS**
SUSAN SELFRIDGE and AMIEE CORLETT, on Behalf of Themselves and All Others Similarly Situated,

**DEFENDANTS**
See attached list

FILED
07 FEB 15 PM 12:20
CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY_____ DEPUTY

(b) County of Residence of First Listed Plaintiff    Marin County
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed    South Korea
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE LAND INVOLVED.

(c) Attorney's (Firm Name, Address, and Telephone Number)
HULETT HARPER STEWART LLP
550 West C Street, Suite 1600
San Diego, CA 92101 Tel: 619/338-1133

Attorneys (If Known)

'07 CV 0312   LAB WMc

**II. BASIS OF JURISDICTION** (Place an "X" in One Box Only)
☐ 1 U.S. Government Plaintiff
☒ 3 Federal Question (U.S. Government Not a Party)
☐ 2 U.S. Government Defendant
☐ 4 Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES** (Place an "X" in One Box for Plaintiff and One Box for Defendant) (For Diversity Cases Only)

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐1 | ☐1 | Incorporated or Principal Place of Business In This State | ☐4 | ☐4 |
| Citizen of Another State | ☐2 | ☐2 | Incorporated and Principal of Business In Another State | ☐5 | ☐5 |
| Citizen or Subject of a Foreign Country | ☐3 | ☐3 | Foreign Nation | ☐6 | ☐6 |

**IV. NATURE OF SUIT** (Place an "X" in One Box Only)

[Nature of suit checkboxes; ☒ 410 Antitrust marked under OTHER STATUTES]

**V. ORIGIN** (PLACE AN "X" IN ONE BOX ONLY)
☒ 1 Original Proceeding ☐ 2 Removed from State Court ☐ 3 Remanded from Appellate Court ☐ 4 Reinstated or Reopened ☐ 5 Transferred from another district (specify) ☐ 6 Multidistrict Litigation ☐ 7 Appeal to District Judge from Magistrate Judgment

**VI. CAUSE OF ACTION** (Cite the U.S. Civil Statute under which you are filing and write brief statement of cause. Do not cite jurisdictional statutes unless diversity.)
Section 16 of the Clayton Act, 15 U.S.C. § 26; Section 1 of the Sherman Act, 15 U.S.C. § 1

**VII. REQUESTED IN COMPLAINT:** ☒ CHECK IF THIS IS A CLASS ACTION DEMAND UNDER F.R.C.P. 23   CHECK YES only if demanded in complaint: JURY DEMAND: ☒ Yes ☐ No

**VIII. RELATED CASE(S) IF ANY** (See instructions): JUDGE Hon. Susan Illston   DOCKET NUMBER CV06-7588 (N.D. Cal)

DATE 02/14/2007   SIGNATURE OF ATTORNEY OF RECORD  Dennis Stewart by JAK

FOR OFFICE USE ONLY
RECEIPT # 135047   AMOUNT $350   APPLYING IFP ___ JUDGE ___ MAG. JUDGE ___
Su 2/15/07

LG.Philips LCD Co., Ltd; LG.Philips LCD America, Inc.; LG Electronics Inc.; Royal
Philips Electronics N.V.; Samsung Electronics Co., Ltd.; Samsung Semiconductor, Inc.;
AU Optronics Corporation; AU Optronics Corporation America; Chi Mei Optoelectronics
Corporation; Chi Mei Optoelectronics USA, Inc.; Sharp Corporation; Sharp Electronics
Corporation; Toshiba Corporation; Matsushita Display Technology Co., Ltd.; Hitachi,
Ltd.; Hitachi Displays, Ltd.; Hitachi America, Ltd.; Hitachi Electronic Devices (USA),
Inc.; Sanyo Epson Imaging Devices Corporation; NEC Corporation; NEC LCD
Technologies, Ltd.; IDT International Limited; International Display Technology Co.,
Ltd.; International Display Technology USA Inc.; Chunghwa Picture Tubes, Ltd.; and
HannStar Display Corporation,

               Defendants.

UNITED STATES
DISTRICT COURT
Southern District of California
San Diego Division

# 135047 - A3
February 15, 2007

Code      Case #        Qty      Amount

CV086900 3-07-CV-0312           60.00 CH
    Judge  - BURNS
CV086400                        100.00 CH
CV510000                        190.00 CH


Total->              350.00


FROM: CIVIL FILING
      SELFRIDGE ET AL V. LG PHILLIPS
      LCD CO ET AL
      GCR 5919  SH